AMERICAN SAMOA GOVERNMENT, Plaintiff

v.

SAMOA AVIATION, Inc., dba SAMOA AIR, Defendant

High Court of American Samoa
Trial Division

CA No. 56-89

June 30, 1989

Before REES, Associate Justice, OLO, Associate
Judge, and AFUOLA, Associate Judge

Counsel: For Plaintiff, Arthur Ripley, Jr.,
Assistant Attorney General
For Defendant, John Ward

## I. Facts

1) This case concerns a certain improved
parcel of real property located at the Pago Pago

144

International Airport and owned by plaintiff American Samoa Government (hereinafter "ASG.") An aircraft hangar was constructed on this parcel during the 1970s. This parcel and the improvements thereon are hereinafter referred to as "the premises."

2) In or about August of 1988 defendant Samoa Aviation, Inc. (hereinafter "Samoa Air") agreed to purchase the American Samoa assets of a bankrupt airline, South Pacific Island Airways, Inc. (hereinafter "SPIA"). The premises that are the subject of this action had previously been leased by SPIA, and some or all of the assets about to be acquired by Samoa Air were housed in the hangar on the premises.

3) The pending acquisition of SPIA's American Samoa assets apparently did not, however, include SPIA's leasehold interest in the premises and/or any property interest SPIA might have had in the hangar located thereon. (This may have been because the lease had terminated automatically with SPIA's bankruptcy, or it may have been because the leasehold interest had been inadvertently omitted by the Bankruptcy Trustee from the list of such assets.) Samoa Air therefore initiated negotiations with ASG to lease the premises.

4) Pending the transfer of assets to Samoa Air by the Bankruptcy Trustee, ASG was using SPIA's American Samoa equipment and facilities --- that is, the assets that were to be transferred to Samoa Air and the hangar in which they were housed --- to provide the inter-island air service that had formerly been provided by SPIA.

5) On or about December 20, 1988, the transfer of SPIA's assets to Samoa Air, including those housed in the hangar, became effective. ASG then ceased its interim airline operations and allowed Samoa Air to go into immediate possession of the premises pending negotiation of a lease.

6) After initial negotiations, a representative of then-Governor Lutali advised Samoa Air that the lease would be on a month-to-month basis. ASG employees, working at the direction of the Governor, prepared a document embodying a month-to-month lease agreement. The Governor then signed this document, but it was not at this point presented to Samoa Air.

145

7) When Samoa Air was offered the month-to-month lease, its representatives requested a five-year lease instead.

8) Samoa Air negotiated with then-Governor Lutali's legal advisor, Lyle Richmond, and Assistant Attorney General Robert Dennison for the five-year term. Governor Lutali was consulted by Richmond and Dennison.

9) As negotiations concerning the Samoa Air lease progressed, Governor Lutali and his legal advisor Richmond were also contacted on a number of occasions by George Wray. Mr. Wray is or was president of the bankrupt SPIA, and has organized another corporation ("Airsystems, Inc.") that is interested in acquiring the premises. He raised a number of objections to the proposed Samoa Air lease.

10) After a meeting with Dennison and Richmond at which the question of a five-year lease to Samoa Air was discussed at length, Governor Lutali approved the proposal.

11) The document that had been signed by the Governor was then revised, while still in the possession of ASG and before any presentation to Samoa Air, by the substitution of a new page 2 containing a five-year term instead of the month-to-month term. A provision may also have been added on page 2 providing that the lease was subject to any claim of the Trustee in Bankruptcy of SPIA. (Mr. Wray had attempted to persuade Richmond that the SPIA lease might still be in effect despite the Trustee's omission of the premises from the list of assets.) It appears that the date --- December 30 --- was also filled in at the same time the new page 2 was inserted. The date is on page 13, just above the Governor's signature.

12) The Governor, however, did not re-sign the document after the replacement of page 2.

13) The document embodying the five-year lease agreement, as drafted and revised by ASG employees Richmond and/or Dennison and bearing the signature of Governor Lutali, was then presented for the first time to James Porter, President of Samoa Air, on December 30, 1988, at the Governor's

146

office. Mr. Porter immediately signed the lease agreement.

14) On or about January 5, 1989, the executed lease agreement was delivered to the Office of the Territorial Registrar for recordation. The lease was recorded the same day by an employee of the Registrar's Office authorized to receive and record such documents.

15) January 5, 1989, the day the lease was recorded, was the first business day after Governor Coleman had replaced Governor Lutali. (December 30, 1988, the date on the lease and the day on which Richmond had presented it to Porter and Porter had signed it, had been the last business day of the Lutali administration.) The person who delivered the lease to the Registrar's Office had been an employee of Governor Lutali and may or may not have been retained by Governor Coleman. He had insisted that the lease, along with some other documents he was delivering, be recorded immediately. According to the testimony of Assistant Territorial Registrar Starr Schuster, the Registrar's Office employee with whom he dealt had complied but had complained to Schuster about being "harassed."

16) Mr. Wray, the former SPIA president who had contacted Lutali administration officials with objections to the proposed Samoa Air Lease, also contacted Governor Coleman "many times" to the same effect. He testified that Governor Coleman had told him there might be problems with leases being approved in the last days of the Lutali administration and that the new administration would need to take a hard look at such leases, or words to that effect.

17) On January 14, 1989, Governor Coleman wrote a letter to Samoa Air president Porter, telling him that "[i]t appears that there are certain areas that may present questions and possibly problems in said lease transaction" and asking Samoa Air "not to rely too much at this time" on the lease.

18) In mid-January 1989, Assistant Registrar Schuster began "reviewing" the lease agreement. She testified that she initiated her own review of the lease without being asked to do so by officials of the new administration, by Mr. Wray, or by

147

anyone else. She testified that she did, however, call the Attorney General's office to discuss what she saw as problems with the lease, and that she also had a brief encounter with George Wray in which he said something about the lease. Schuster did not, however, discuss the matter with her immediate superior, Territorial Registrar Pelema Kolise.

19) On February 6, 1989, during a two-day period when the Territorial Registrar was on leave and Ms. Schuster was serving as Acting Registrar, she decided she should cancel the previous recordation of the Samoa Air Lease. This she did by writing "VOID" across the stamp, date, and signature that had indicated recordation by the Registrar's Office.

20) Ms. Schuster testified that the Registrar's Office had never previously, to her knowledge, attempted to cancel the recordation of a document that had already been recorded. The Court asked why she chose to inaugurate a new activity for the Registrar's Office --- the cancellation or retroactive "rejection" of registrations --- during a two-day stint as Acting Registrar without prior discussion with the Territorial Registrar himself. She merely shrugged good-naturedly and repeated her earlier testimony that she had told the Registrar about it afterward.

21) On the same day Ms. Schuster "rejected" the registration, she wrote a letter to the Attorney General saying that she had done so. She gave three reasons: (1) the absence of a specific clause in the lease providing for a land valuation index adjustment on the rental rate, as required by A.S.C.A. § 37.2020; (2) "Page 2 of the agreement is questionable" (the text began too high on the page); and (3) "Who is the LESSEE here?"

22) The lease designates "Samoa Aviation" as the lessee. The space designated for the signature of a representative of the lessee was signed by James Porter. (The full text of this section, including Porter's signature, is "LESSEE: By: James Porter.") As Ms. Schuster knew at the time, documents in the Registrar's office listed James Porter as an officer of Samoa Aviation, Inc. As she testified at trial, her questions about who the lessee was therefore boiled down to the omission of "Inc." on the lease document.

23) On April 7, 1989, Attorney General Fa'alevao wrote a letter to Mr. Porter demanding that Samoa Air vacate the premises. He stated that "[i]t was this failure to include Provisions of 37.2020 ASCA [the inflation adjustment clause] that caused the Office of Territorial Registrar to reject the document. He also stated that Samoa Air had not paid any rent. (Mr. Porter says Samoa Air has in fact paid all rents due under the lease agreement, and ASG makes no contrary allegation in this action.)

24) On May 4, 1989, Mr. Porter responded to the Attorney General. He wrote that in his opinion Article IV of the lease, "requiring the lessee to comply with all territorial authorities in force pertaining to the premises," effectively incorporated the inflation adjustment clause. He also stated that all rentals were current.

25) On May 17, 1989, the Attorney General again wrote to Porter. In this letter he said that ASG had "determined that the hangar itself . . . is the property of SPIA," and that "SPIA then sometimes ago transferred its interests therein to Airsystems, Inc. [Mr. Wray's new company]." Samoa Air was thus "advised that as far as any further occupancy of the said hangar, Samoa Aviation has to make arrangement with Airsystem, Inc. officials." (ASG does not base the present action upon a claim of ownership of the hangar by Airsystem, Inc. Rather, ASG relies on its own undisputed title to the land on which the hangar is located and on the alleged flaws in the lease of the premises --- the land and its improvements, including the hangar--- to Samoa Air.)

26) A few days later Samoa Air brought an action against ASG, Mr. Wray, and Airsystems, Inc., claiming that Mr. Wray and Airsystems had entered onto the premises in violation of the Samoa Air lease. Samoa Air demanded, inter alia, a preliminary injunction against further entry upon the premises by Wray or Airsystems. After Samoa Air had presented its evidence at a hearing on its motion for a preliminary injunction, ASG, Mr. Wray, and Airsystems stipulated to the injunction. At the time of the stipulation Mr. Wray and counsel for ASG indicated their intention to bring a summary action for eviction against Samoa Air.

27) On June 16, 1989, ASG brought the present action for eviction, invoking the summary proceedings provided by A.S.C.A. § 43.1301. Trial of the case was held on June 26, 1989.

## Conclusions of Law

It would be disingenuous not to observe that this controversy, while presenting questions of law and fact appropriate for judicial resolution, is seen by many of those involved as a political dispute. Counsel and witnesses for ASG directed the Court's attention to what they regarded as the unseemly haste with which the lease was concluded in the last days of the Lutali administration. Samoa Air, in turn, wafted suggestions of chicanery and vindictiveness within the new administration. The Court's job is to try to decide the legal questions without passing judgment on the political ones.

Lutali was Governor until noon on January 3, 1989. During that time he was legally entitled to exercise all the powers of the office, including whatever power the Governor has to make contracts that are binding on ASG. Coleman has been Governor from that time forward and has the right to exercise the same powers to their full extent. It should go without saying that whether the Court thinks either the former or present Governor, or his subordinates, acted wisely or unwisely does not matter. The only question is whether ASG and Samoa Air have a contract.

ASG urges that the five-year lease never became effective because A.S.C.A. § 30.0131 requires any transaction by which a corporation acquires an interest in land to be "approved in writing by the Governor." ASG contends that since a leasehold interest is an interest in land, and since the Governor did not re-sign the lease document after his subordinates had revised Page 2, this statutory requirement was not met.

Assuming that one who takes a five-year lease "acquires an interest in land" within the meaning of A.S.C.A. § 30.0131, we conclude that the lease does meet the statutory requirement of approval in writing by the Governor.

The five-year lease presented by ASG to Samoa Air did in fact contain the Governor's signature.

Although counsel for ASG and Mr. Wray (who was a witness for ASG) suggested that the Governor's subordinates may have changed the lease after he signed it without his knowledge or approval, Governor Lutali himself testified that he discussed the question at length with Dennison and Richmond and that he did approve the revision. The revision he approved did not entail any changes on the signature page. We decline to construe A.S.C.A. § 30.0131 as requiring the Governor either have re-signed below his original signature or to have ordered the destruction of the last page and the preparation of a new one so that he could sign again.

The document that ASG presented to Samoa Air was "in writing." The writing contained the five-year provision and also contained the Governor's signature. The Governor knew it contained both these things. The order in which they got there was up to him.

ASG also urges, however, that the lease was invalid because it did not include a specific provision for the periodic adjustment of rental payments. A.S.C.A. § 37.2020 provides that "no lease of real property owned or controlled by the government may be entered into" for more than four years unless it contains such a provision. It does not say what happens when the Government and another party nevertheless enter into such a contract. The statute does not provide, as many statutes do, that a contract violating its provisions is invalid or without legal effect. At least in a situation such as that presented by the present case --- where the offending document was drafted by ASG itself and where the lessee has no objection to reformation of the contract (or construction of the clause requiring compliance with all applicable laws) to require periodic adjustment of the rent --- the appropriate remedy would appear to be reformation or construction to conform to the law rather than invalidation.

This is consistent both with the apparent intentions of the contracting parties and with the purpose of § 37.2020. There is no evidence that the escalator clause was left out for any reason other than inadvertence. Nor does the text or context of § 37.2020 give us any reason to believe that its purpose is to punish wrongdoers by

151

forfeiture rather than to ensure a fair return for the government.

> Courts have been increasingly reluctant to refuse enforcement on the ground of mere noncompliance with some regulatory law. A court may disregard the noncompliance if the regulation is intended to serve only an economic interest, and not an interest in health or safety . . . . And it may infer, from the legislature's silence on the question of unenforceability when compared with explicit provisions in similar legislation, that this additional sanction is inappropriate.

Farnsworth on Contracts § 5.5 at 355-56 (1982) (citations omitted). See also Restatement of Contracts 2d § 178. Accordingly, we hold that ASG has the right under the lease, as modified by A.S.C.A. § 37.2020, to adjust the rent upward or downward for inflation at intervals of its choosing.[1] It cannot, however, use its own failure to include this term in the document as a pretext for invalidation and eviction.

Finally, we hold that the lease was recorded by the Territorial Registrar on January 5, 1978 and therefore complied with the requirement of A.S.C.A. § 30.0131 that it be so recorded. We express no opinion on whether the February 6 action of the Acting Registrar would have cancelled the effects (if any) of the January 5 recordation if the lease were actually invalid. We also express no opinion on whether A.S.C.A. § 30.0131 would have rendered the lease invalid if the Territorial Registrar had simply refused to register the document when it was presented on January 5. In this case the document

---

[1] This case is somewhat different from the typical case involving the modified enforceability of contracts that fail to conform with statutory requirements, since in most such cases it is the presence rather than the absence of a particular provision that offends the law. Modifying contracts by striking clauses out presents fewer problems for courts than putting them in. In this case, however, the questions left open by the statute can be resolved by leaving them up to A.S.G. itself, which has the right to insist on a provision "satisfactory to the lessor." A.S.C.A. § 37.2020.

The requirement of the statute would presumably be even more clear if ASG had promulgated a regulation to make applicable "recognized indexes by government agencies." Although A.S.C.A. § 37.2020 was enacted in 1978 and specifically requires the adoption of such a regulation, A.S.G. has adopted none to date.

152

was not invalid and it was in fact recorded.[2] All the statutory requirements having been met on January 5, the lease became effective on that day and the Acting Registrar had no discretionary power to divest Samoa Air of its contractual rights on February 6.

Order

We conclude that the five-year lease is enforceable, subject to the right of plaintiff to adjust the rent upward or downward for inflation at intervals of its choosing.

Judgment will therefore issue for the defendant.

We note that ASG has already filed a Motion for New Trial, based on the Court's remarks from the bench and in anticipation of the formal entry of judgment. This motion, and any revision thereof to state additional grounds within ten days from the entry of this order, will be heard on July 21, 1989.

Due to the summary nature of these proceedings, neither counsel nor the Court has had the opportunity to do much research into the questions presented by this case. Thus far not one case from any jurisdiction has been cited to the Court by either counsel. And yet the questions presented --- particularly the question whether a contract that omits a clause required by statute is on that account absolutely unenforceable --- are of the sort on which there must certainly be precedents from other jurisdictions, some of them presumably thoughtful and persuasive.

---

[2] A.S.C.A. § 4.1104 provides that the registrar may "reject any instrument appearing to be illegal." A.S.C.A. § 4.1106 provides that "any person aggrieved by any official action of [the Registrar] may, at any time, apply to the High Court for direction or redress." At trial counsel for ASG urged that since Samoa Air had not directly appealed the Acting Registrar's retroactive rejection of their lease, they and the Court were bound by this action. It appears from the record, however, that Samoa Air was never directly notified of the "rejection" and did not learn of it until shortly before this action for eviction was brought. Moreover, A.S.C.A. § 4.1104 does not provide any specific procedure for correction by the High Court of errors by the Registrar; rather, it provides for a broad right to "apply to the High Court for direction or redress" and to do so "at any time." By urging as a defense to this action that the lease was in fact legal and that it should have been recorded, Samoa Air has applied for such redress.

In retrospect, this was not the sort of case that should have been tried ten days after it was filed. The purpose of summary eviction proceedings is to provide speedy relief for landowners against deadbeats and squatters who have no fairly arguable legal right to remain on the premises and who would otherwise take unfair advantage of the law's delay. This was clearly not such a case. The Court therefore puts counsel on notice that it will take the motion for new trial seriously, especially insofar as questions of law are concerned. Counsel are urged to provide such authorities to the Court as might have been provided at or before trial there had been more time.

Judgment will issue for the defendant denying the requested relief.

It is so ordered.